PERDUE FARMS, INC., Plaintiff,

v.

NATIONAL LABOR RELATIONS BOARD and Willie L. Clark, Jr., Regional Director of the Eleventh Region of the National Labor Relations Board, Defendants.

No. 2:96–CV–27–BO(1).

United States District Court, E.D. North Carolina, Northern Division.

July 23, 1996.

Charles P. Roberts, III, Haynsworth, Baldwin, Johnson & Greaves, Greensboro, NC, for plaintiff.

Donald R. Gattalaro, NLRB—Region 11, Winston–Salem, NC, Margery E. Lieber, NLRB, Spec. Litigation Branch, Abby Propis Simms, D. Criss Parker, Washington, DC, for defendants.

## ORDER

BOYLE, District Judge.

The facts and circumstances of this case are contained in this Court's opinion and order of May 29, 1996, issuing the temporary restraining order sought by plaintiff. *Perdue Farms, Inc. v. N.L.R.B.*, 927 F.Supp. 897 (E.D.N.C.1996). That opinion is hereby adopted in full to the extent it is necessary for a complete understanding of this order.

By its terms, the temporary restraining order expired on June 8, 1996. The defendants have since scheduled to resume, on July 17, 1996, the conduct of hearings on the Union's objections relating to the second Lewiston election. The plaintiff has filed a motion for preliminary injunction, which was the subject of a hearing held on June 7, 1996. The defendants have subsequently moved to dismiss the case for lack of subject matter jurisdiction, failure to state a claim, and mootness.

\* \* \*

As discussed previously, this Court has jurisdiction over the subject matter of the labor dispute pursuant to 28 U.S.C. § 1337(a). *See Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958). Jurisdiction over the dispute arising under the Freedom of Information Act ("FOIA") is conferred by 5 U.S.C. § 552(a)(4)(B).[1] The parties have offered arguments in support of their competing motions, which are addressed in turn. The facts as previously recited by the Court are uncontested.[2]

---

1. The NLRB correctly argues that the Freedom of Information Act cannot support jurisdiction under *Leedom*. The Court's previous order clearly cannot be interpreted as suggesting otherwise.

2. Additional facts which have only recently come to the Court's attention concern a remarkably similar case, *N.L.R.B. v. Carolina Food Processors, Inc.*, 81 F.3d 507 (4th Cir.1996). In *Carolina Food*, U.F.C.W. Local 204 was suspect-

*I. The Labor Dispute*

### A.

The Board is correct in asserting that a "party must make a 'strong and clear' showing that the Board disregarded a 'clear, specific and mandatory provision of the [Labor] Act.'" (Memo.Supporting Dismissal, p. 8, quoting *McCulloch v. Libbey–Owens–Ford Glass Co.,* 403 F.2d 916, 917 (D.C.Cir.1968), *cert. denied,* 393 U.S. 1016, 89 S.Ct. 618, 21 L.Ed.2d 560 (1969)). The clear, specific and mandatory provision of the Labor Act disregarded by the Board in this case is 29 U.S.C. § 159(c)(1), specifically, that provision of the statute which uses mandatory language in declaring that "the Board *shall* investigate" election petitions.

■ The Board claims it is under no mandate to conduct any investigation, erroneously relying upon cases which recognize the Board's discretion in establishing procedures for the determination of whether a question concerning representation exists. The Board's discretion to decide the existence of a question concerning representation means that "the *accuracy* of the Board's basis in ordering an election is of no concern to the employer." *Intertype Co. v. N.L.R.B.,* 401 F.2d 41, 43 (4th Cir.1968), *cert. denied,* 393 U.S. 1049, 89 S.Ct. 686, 21 L.Ed.2d 691 (1969) (emphasis added). It does not mean that the Board may dispense with the mandatory investigation, or conduct the investigation contrary to established policy, such that it altogether lacks a basis for ordering the election. The Board thus misinterprets the statement of *Newport News Shipbuilding & Dry Dock Co. v. N.L.R.B.,* 633 F.2d 1079, 1081 (4th Cir.1980), that "[s]ection 9(c) hearings and investigations are particularly within the Board's discretion." The lan-

guage clearly speaks to the manner in which hearings and investigations are conducted, not the requirement to investigate petitions.

Were the Board correct, it could order or refuse to order an election without consulting the relevant petition, thereby displacing the employees in their exercise of section 7 rights. Congress could not have intended such a result. As another of the cases relied upon by the Board declares, "the statute requires an investigation." *Modern Plastics Corp. v. McCulloch,* 400 F.2d 14, 17–18 (6th Cir.1968); *see also Newport News,* 633 F.2d at 1082 ("the Board has met its statutory obligation by conducting an investigation"); *accord Brotherhood of Railway & Steamship Clerks, et al. v. Ass'n for Benefit of Non–Contract Employees,* 380 U.S. 650, 661, 85 S.Ct. 1192, 1198, 14 L.Ed.2d 133 (1965) (footnote omitted) ("[T]he Board's action ... is reviewable only to the extent that it bears on the question of whether it performed its statutory duty to 'investigate' the dispute.") (Railway Labor Act); *Miami Newspaper Printing Pressmen's Union Local 46 v. McCulloch,* 322 F.2d 993 (D.C.Cir.1963) (*Leedom* applicable to "shall certify" clause of § 9(c));[3] *Templeton v. Dixie Color Printing Company,* 444 F.2d 1064 (5th Cir.1971) (per Justice Clark) (*Leedom* applicable to "shall direct an election" clause of § 9(c)); *Surratt v. N.L.R.B.,* 463 F.2d 378 (5th Cir.1972) (same).

The Board cites in its earlier briefs two non-controlling cases for the proposition that § 9(c) is not mandatory. In its reply brief, however, the Board declares that it "has never denied the presence of mandatory 'shall investigate' language in Section 9(c)(1) of the Act," and revives the argument that an investigation actually took place. (Reply Brief, p. 2). Whatever the Board's position

---

ed of having forged authorization cards forming the basis for an election. *Carolina Food,* 81 F.3d at 512–13; *see also* Dockery Affidavit, p. 4 (suggesting forgery at Carolina Food Processors).

The Union lost the election, but the result was not certified pending Union objections. The Union subsequently claimed to have obtained a card majority prior to the election. The NLRB therefore obtained a subpoena directing the employer to produce its employee signature records, which the employer resisted unless it were granted equal access to the authorization cards for the

purpose of conducting its own handwriting analysis. The NLRB declined the employer's request and obtained enforcement of its subpoena.

After the Fourth Circuit affirmed, the NLRB withdrew the request for production of signatures because the union withdrew its refusal to bargain charges based on the claimed card majority.

**3.** Of course, the Board need not certify elections tainted by improper conduct. *Miami,* 322 F.2d at 997–98.

now, the Court has considered the cases first cited by the Board and finds them unpersuasive.

In *National Maritime Union of America v. N.L.R.B.*, 375 F.Supp. 421, 429 (E.D.Pa.), *aff'd*, 506 F.2d 1052 (3rd Cir.1974), *cert. denied*, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975), the district court held that words such as "shall" and "shall not" are only "apparently" mandatory, and that courts must discern the words' true legislative intent from, among other sources, the "prior practice in the Board." The strained logic of *National Maritime Union* was not necessary to address the question at hand, a union's attempt to have the Board recognize its petition to represent workers overseas (*see McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963)), and is of questionable validity. "When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 254, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992) (citations omitted); *United States v. State of North Carolina*, 914 F.Supp. 1257, 1267 (E.D.N.C.1996). *United States Metal Co. Employees' Assoc. v. N.L.R.B.*, 478 F.Supp. 861 (W.D.Pa.1979) is readily distinguishable, because unlike this case, *see infra*, a technical § 8(a)(5) procedure was an available remedy.

### B.

■ "The deference owed the Board as the primary guardian of the bargaining process is well established. It will not extend, however, to the point where the boundaries of the Act are plainly breached." *N.L.R.B. v. Lundy Packing Co.*, 68 F.3d 1577, 1583 (4th Cir.1995), *cert. denied*, —— U.S. ——,

116 S.Ct. 2551, 135 L.Ed.2d 1071 (1996).[4] The Board correctly argues that it "must necessarily develop election policies and requirements which are not addressed in the statute." (Memo.Supporting Dismissal, p. 9 n. 4). The Court finds that this is what the Board has done in adopting the Casehandling Manual guidelines discussed in the previous opinion, as well as 29 C.F.R. § 101.18, "Investigation of petition:"

(a) Upon receipt of the petition in the Regional Office, it is docketed and assigned to a member of the staff, usually a field examiner, for investigation. The field examiner conducts an investigation to ascertain ... (3) whether the election would ... reflect the free choice of employees in the appropriate unit, and (4) whether, if the petitioner is a labor organization seeking recognition, there is a sufficient probability, based on the evidence of representation of the petitioner, that the employees have selected it to represent them.

It is unnecessary to revisit the factual insufficiency of the Board's alleged "investigation,"[5] except to note that at least one circuit has reached a conclusion identical to that previously announced—and still maintained—by this Court. In an unpublished opinion, a panel of the Sixth Circuit declared:

[T]he statutory obligation to conduct an investigation of decertification petitions was not satisfied ... where the Regional Director merely recited that an investigation had been conducted. The record clearly evidences that the Regional Director did little more than review the petition itself; such a review falls short of the Act's requirement.

*Ondusko v. Colfor, Inc.*, 734 F.2d 15 (6th Cir.1984) (unpublished).[6] The question is

---

**4.** The Court does not claim, as the Board alleges, that the guidelines are being read so as to "transform § 9(c) into a mandatory provision." (Memo. Opposing Prelim. Inj., p. 18). Congress has made § 9(c) mandatory. The Board's abandonment of the rules and regulations adopted to effectuate its statutory mandate serves as evidence that the Board is ignoring the statute.

**5.** The Court has not, contrary to the Board's argument, implicitly admitted the existence of an investigation by attacking the alleged investiga-

tion's scope. (Memo. Opposing Prelim. Inj., p. 20 n. 13).

**6.** Section 9(c) does not distinguish among various types of election petitions. Although the case law is more developed in circumstances where the Board has been presented with decertification petitions, the duty to investigate and the legal effect of a fraud in the procurement of the petition are identical in cases where the election petition promotes unionization.

now whether, having developed its "policies and requirements," the Board may now ignore them without explanation. Clearly the Board may not.

## C.

This Court is not alone in its desire to see the NLRB display some cognizance of the guidelines set forth by the Board in its Casehandling Manual. The Court of Appeals for the District of Columbia Circuit has recently held that the Board abused its discretion when it reversed a regional director's decision made pursuant to a Manual guideline. *Shepard Convention Services, Inc. v. N.L.R.B.*, 85 F.3d 671 (D.C.Cir.1996).

In *Shepard Convention*, a Regional Director denied a union's request to conduct a certification election by mail, relying on a Casehandling Manual provision suggesting that "the use of mail balloting ... should be limited to those circumstances that clearly indicate the infeasibility of a manual election." *Casehandling Manual*, § 11336. The NLRB allowed interlocutory review and reversed the Regional Director's decision. The employer subsequently refused to bargain with the "mail-elected" union and was found to have committed an unfair labor practice in violation of 29 U.S.C. §§ 158(a)(5), (1).

The Court of Appeals denied enforcement, finding that the Board lacked authority to reverse the Regional Director's denial of the application for an election by mail. The court held that the NLRB lacked "compelling reasons" to issue its order, 29 C.F.R. § 102.67(c), since the Regional Director had followed the "Board's established policy." *Shepard Convention*, 85 F.3d at 674. "While the Manual 'provides guidance only and is not a form of authority binding on the Gener-

al Counsel or the Board,' its provisions *a fortiori* reflect the Board's policies." *Shepard Convention*, 85 F.3d at 674 n. 7 (citation omitted).

■ *Shepard Convention* stands for the proposition that the NLRB departs from established policy whenever it acts in direct contravention of the Casehandling Manual, and that such departures must be justified by compelling reasons.[7] The law of this circuit requires nothing less. In a case described by the Fourth Circuit as "a classic § 9(c)(5) violation,"[8] the NLRB was found to have inexplicably manipulated its policies to satisfy the demands of the Union involved in the present action, and enforcement of the Board's bargaining order was consequently denied. *Lundy Packing*, 68 F.3d at 1581.[9]

In *Consolidated Papers, Inc. v. N.L.R.B.*, 670 F.2d 754 (7th Cir.1982), the Board improperly entertained a petition contrary to policy, but the Union urged the Seventh Circuit to "ignore the error" in the interest of "judicial economy because its petition would eventually have become [proper]." *Id.*, 670 F.2d at 758 n. 6. The court refused:

> To disregard the Board's failure to apply its own rule ... would be to sanction arbitrary action by the Board. Whatever the propriety of its decision on the ... issue, the Board remains obligated to apply its precedent with reasonable consistency.

*Id.*

■ The NLRB's adoption of its regulations and guidelines belie the argument that it enjoys absolute discretion to act in any manner it sees fit. The Supreme Court has made a distinction between two entirely distinct uses of the term discretion. In one sense of the word, an official has dis-

---

7. The Court does not interpret *Shepard Convention* as simply standing for the proposition that the Board has a limited ability to grant interlocutory review of decisions made within the scope of the guidelines.

8. Section 9(c)(5) prohibits the NLRB from tailoring a bargaining unit to "the extent to which the employees have organized," effectively certifying a bargaining unit of the Union's choosing where doing so would not otherwise be appropriate.

9. The evidence in this case indicates that card forgery is a common practice of this Union,

(Dockery Affidavit, p. 10), and that cards were forged during the Union's Lundy Packing campaign:

> He said, "Brian [Murphy, President of Local 204], these cards need signatures—you can handle that the way you did at Lundy's," and then he laughed. Brian said something like— "that many cards?" ... [Local 204 President Murphy] then began forging signatures on the cards ...

(Dockery Affidavit, p. 4).

cretion when he or she 'is simply not bound by standards set by the authority in question.' R. Dworkin, Taking Rights Seriously 32 (1977).... But the term discretion may instead signify that 'an official must use judgment in applying the standards set him [or her] by authority'; in other words, an official has discretion when the standards set by a statutory or regulatory scheme 'cannot be applied mechanically.' Dworkin, *supra*, at 31, 32; see also *id.*, at 69 ('[W]e say that a man has discretion if his duty is defined by standards that reasonable [people] can interpret in different ways').

*Board of Pardons v. Allen,* 482 U.S. 369, 375–76, 107 S.Ct. 2415, 2419, 96 L.Ed.2d 303 (1987).[10] However broad the discretion granted the NLRB by Congress, it is this latter, more limited type of discretion to which the NLRB consented by adopting a Casehandling Manual replete with highly detailed guidelines specifying procedures in particular cases:

> Whatever the Board's chosen criteria for decision, they must be applied consistently. "[W]hen the Board adopts a policy to guide it in the exercise of its discretion, the original very broad discretion is to some extent narrowed, and subsequent decisions must be reasonably consistent with the expressed policy." *Westvaco, Va., Folding Box Div. v. N.L.R.B.,* 795 F.2d 1171, 1173 (4th Cir.1986), *quoting Consolidated Papers, Inc. v. N.L.R.B.,* 670 F.2d 754, 757 (7th Cir.1982). Courts have insisted "that the Board apply with reasonable consistency whatever standard it adopts to guide the exercise of its delegated power." *Continental Web Press, Inc. v. N.L.R.B.,* 742 F.2d 1087, 1089 (7th Cir.1984). While the Board may choose to "depart from established policy, it must explicitly announce the change and its reasons for the change." *Westvaco,* 795 F.2d at 1173, *quoting Consolidated Papers,* 670 F.2d at 757.

*Lundy Packing,* 68 F.3d at 1583 (full citations added). "The Board is allowed to reverse course. But it has got to give reasons, or else the reversal is arbitrary." *Continental Web,* 742 F.2d at 1093.

The concepts of discretion described by Dworkin, adopted by the Supreme Court in *Allen,* necessarily (if not explicitly) informed the opinions of the Fourth Circuit in *Lundy Packing* and *Westvaco,* the D.C. Circuit in *Shepard Convention,* and the Seventh Circuit in *Consolidated Papers* and *Continental Web* that the Board will be required to justify with compelling reasons a wholesale abandonment of established policy. The NLRB will not be required to have its guidelines "applied mechanically," but neither should the Board be surprised to discover that courts will call it to answer for exercises of discretion which drift too far from established policy and into that realm of absolute discretion characterized by arbitrariness.

**D.**

■ The investigation upon which the Court would insist does not concern a trivial matter. The command of Board and Circuit precedent relating to elections based upon a fraudulent showing of interest is unmistakable: such elections are *void ab initio,* and their fraudulent basis may not be cured by any election result. The discussion of this point which now follows is made necessary by the Board's arguments that it may refuse an investigation because the fraud would be of no legal consequence.

In *Ron Tirapelli Ford, Inc. v. N.L.R.B.,* 987 F.2d 433 (7th Cir.1993), an employer improperly coerced his employees to signing a de-certification petition, upon which an election was held whereby the union was decertified. The fraud was not discovered until after the election. The NLRB found the employer had committed an unfair labor practice, set aside the election, and issued a

---

10. The statute at issue in *Allen,* held by the Supreme Court to create a liberty interest in parole, left much room for discretion:

> [T]he board *shall* release [prisoners] on parole ... when in its *opinion* there is *reasonable* probability that the prisoner can be released without detriment to the prisoner or to the

community ... [a] prisoner shall be placed on parole only when the board *believes* that he is able and willing to fulfill the obligations of a law-abiding citizen.

*Allen,* 482 U.S. at 376–77, 107 S.Ct. at 2420, quoting Mont.Code Ann. § 46–23–201 (1985) (emphasis original and added).

bargaining order. The Seventh Circuit affirmed and entered an enforcement order.[11]

Tirapelli Ford argued, as does the Board here, that "[o]nce a fair election has been held ... the employees have exercised their rights ... and the taint on the underlying petition becomes a moot question." *Tirapelli*, 987 F.2d at 438 (citation omitted). The General Counsel did not agree:

> Since the RM petition itself was tainted by the Company's unfair labor practices, it and the subsequent election were a nullity, and, as the Board explained, "the parties [must be] restored to the status quo ante with respect to their bargaining relationship."

*Tirapelli*, 987 F.2d at 439, citing NLRB Brief.

> The Board has long taken the view that an employer-assisted decertification petition ought to be canceled and the party returned to the status quo ante. The petition, tainted by the employer's unfair labor practices, is a nullity ... Here ... the tainted decertification petition became the basis of an election before the employer's illegal conduct came to light. In the Board's view, the holding of the election ought not alter the result. The tainted petition is a nullity; the resulting election is a nullity.

*Tirapelli*, 987 F.2d at 442.

Upon considering the propriety of the remedy, the Seventh Circuit accepted the Board's position:

> [T]he Board acted well within the discretion given it by Congress when it determined that ... such a petition ought to be held invalid, even in the comparatively rare case, such as this one, where the election occurs before the discovery of the illegality. The direct insinuation of the employer into the election process through the filing of a bogus petition *requires* the Board to confront several serious issues that *require* firm and decisive action on its part.

*Tirapelli*, 987 F.2d at 443 (emphasis added). Where the employer "staged the entire electoral process," the Board properly "nullifi[ed] ... the entire scheme." *Id.; see also Hall Industries, Inc.*, 293 N.L.R.B. 785, 1989 WL 223957 (1989), *aff'd*, 914 F.2d 244 (3rd Cir. 1990) (Board declared election petition "void ab initio" where employer "actively stimulated the decertification effort."). The Board could hardly take a different position where a union submits a bogus petition based upon hundreds of cards forged by the union's president, and it cannot avoid reaching such unpleasant decisions by deliberately turning a blind eye to the fraud in violation of its statutory duty.

Yet the NLRB now contends that the showing of interest is irrelevant, since an election has been held where a number of employees otherwise sufficient to establish a showing of interest voted for the Union. This position is not only contrary to law, but antithetical to the NLRB's historical position as stated in case after published case. In *Tirapelli*, for example, the Board

> was entitled to conclude that considerations of deterrence and the stability of existing bargaining relationships vastly outweigh the rather remote possibility that an election conducted under these circumstances might reflect the desires of the employees.

*Tirapelli*, 987 F.2d at 443.[12] In *Hearst Corp.*, 281 N.L.R.B. 764, 1986 WL 68561 (1986), *aff'd*, 837 F.2d 1088 (5th Cir.1988), the Board held that an employer may not refuse to bargain based on an election petition "tainted" by its own coercion. That seventeen petition signatories from the fifty-six member bargaining unit—thirty percent of the employees—came forward to testify that they were unaware of the employer's allegedly coercive conduct did not sway the Board:

> An employer that has engaged in unlawful conduct ... cannot expect to take advantage of the chance occurrence that some of

---

11. The Court of Appeals remanded for further consideration the NLRB's order that the employer make a contribution to the fringe benefits fund.

12. Unlike *Tirapelli*, the side allegedly perpetrating the fraud in the instant case lost the election—twice. This circumstance lends credence to the allegations that there never existed among the employees a sufficient interest in union representation.

its employees may be unaware of its actions.... The finding of a violation is not predicated on a finding of actual coercive effect, but rather on the "tendency of such conduct to interfere with the free exercise of employee rights under the Act."

*Hearst,* 281 N.L.R.B. at 765 (footnote omitted); *see also Hancock Fabrics,* 294 N.L.R.B. 189, 1989 WL 224029 (1989) (same); *contra Gaylord Bag Co.,* 313 N.L.R.B. 306, 307, 1993 WL 496592 (1993) ("[e]ven if seven authorization cards were rejected as tainted, there would still have been an adequate showing of interest.").

The illegal behavior suggested by the evidence in the instant case is of a far more serious nature than that which occurred in *Tirapelli, Hearst, Hall Industries,* or *Hancock Fabrics.* In those cases, the mere hint that some of the employees were improperly influenced—regardless of any "actual coercive effect"—was enough to taint the showing of interest even where a sufficient number of employees clearly exercised their section 7 rights in a free and voluntary fashion. Here, the question is not whether any employees were improperly coerced into signing an election document; the question is whether a substantial number of employees ever applied pen to paper. Since forging an employee's signature on a union authorization card "tend[s] ... to interfere with the free exercise of employee rights under the Act" just as surely as does improper persuasion, the Board's argument that some number of valid cards or votes could cleanse the taint from the purported showing of interest must be rejected.

The cases cited by the Board in support of its argument are distinguishable. The lengthy passage from *Intertype* cited by the Board, 401 F.2d at 43, simply states the truism that § 9(c) authorizes the Board to investigate a question concerning representation without a showing of interest, since the showing of interest is the manner by which the Board determines whether an election is to be held. *Gaylord Bag Co.,* 313 N.L.R.B. 306, 1993 WL 496592 (1993) was distin-

guished from *Tirapelli,* where a party had "abused the Board's processes." *Id.,* 313 N.L.R.B. at 307 n. 5. *Sheffield Corp.,* 108 N.L.R.B. 349, 350 (1954) notes that investigation of the showing of interest "has no bearing on the issue of whether a representation question exists," and that an investigation can take place following notice of a representation hearing, but it does not state that § 9(c) investigations are unnecessary.

**E.**

Nowhere in the Board's voluminous briefing is a single argument proposed to explain why the facts of this case compel the abandonment of its investigation policy. The Board seeks to be free of this Court's jurisdiction, and propounds many arguments claiming it should not have to answer for its acts and omissions in court. Concealed by these claims of discretion is any reason that might explain its manifestly exceptional and unusual behavior.

At present, the only possible explanation for the Board's behavior is the one proposed by the employer: "that the NLRB is manipulating its election rules capriciously in order to foster the interests of the United Food & Commercial Workers Union." (Citation of Subseq.Decided Authority).[13] In support of this contention, the employer cites *Good Shepherd Home, Inc.,* 321 N.L.R.B. No. 56, 1996 WL 296562 1996 NLRB Lexis 346 (1996), in which Member Cohen's concurring opinion described the Board's ever-shifting rules relating to reimbursement of employees for election-related travel expenses. In *Young Men's Christian Assoc.,* 286 N.L.R.B. 1052, 1987 WL 90019 (1987), an employer violated the rule because the reimbursement was not reasonably related to the value of the employee's time and costs. In *Sunrise Rehabilitation Hospital,* 320 N.L.R.B. No. 28, 1995 WL 791954 (1995), the *Y.M.C.A.* reasonableness standard was abandoned and a union objection sustained, as the NLRB proscribed all payments "that exceed reimbursement for actual transportation expenses." In *Perdue Farms,* 320 N.L.R.B.

---

13. The Court does not comment on the validity of this argument, but neither can it ignore the

mounting evidence in support of the proposition.

No. 64, 1996 WL 46340 (1996), which precipitated the second election now at issue, the Union's objection was sustained under the *Sunrise* rule because Perdue offered 4 hours' pay to workers not scheduled to work on the day of the election in reimbursement for coming to vote. But in *Good Shepherd,* the Union's payment of $25 to an off-duty employee in reimbursement for his driving fifty miles to vote was not objectionable because the payment was *"clearly related* only to actual travel expenses." 1996 WL 296562 at *2 1996 NLRB Lexis 346 at *4. The Board took pains to dispute Member Cohen's opinion that it had effectively revived *Y.M.C.A.'s* reasonable relationship rule, but its reasoning is unpersuasive. After all, *Good Shepherd* states that parties would not be required "to produce receipts or other proof of the employee's 'actual' costs or to otherwise prove that the reimbursement was precise to a mathematical certitude," *id.,* (internal quotation marks original), and based its decision on a conclusion that the Union's "conduct . . . involve[d] only the *good-faith* attempt to cover." 1996 WL 296562 at *2 1996 NLRB Lexis 346 at *6 (emphasis added).

*Perdue* was decided on January 31, 1996. The decision in *Good Shepherd* was issued May 31, 1996. Both cases involved the same Union, which enjoyed the benefit of a far looser standard to measure its own conduct than that it demanded—and received—for judging substantially similar conduct by the plaintiff.

As discussed, the instant case has also witnessed a remarkable reversal by the Board relating to the effect of an election outcome upon a fraud inherent in the underlying election petition. In *Lundy Packing,* the Board was actually found to have manipulated the rules at UFCW Local 204's behest. Thus, as the cases demonstrate, the Board has not only abandoned its Casehandling Manual, but no less than three times where this particular Union local is involved, its legal policy as well.[14] Such dramatic reversals tend to create an appearance of parti-

sanship the Board can ill afford if it hopes to retain a supervisory role over labor relations.

Yet the legal policy reversals do not reveal the full extent of the Board's efforts on behalf of this Union. Following the opinion in *Lundy Packing* terminating the case in the employer's favor, the Board attempted to resuscitate the case by re-opening the representation petition for the purpose of counting challenged ballots. The Fourth Circuit issued an order, *N.L.R.B. v. Lundy Packing Co.,* 81 F.3d 25 (4th Cir.1996) declaring that its prior order terminated all administrative proceedings. Because the case was moot, the Court saw no need to issue the employer's request for a writ of mandamus. Undaunted, the Board filed a motion to reconsider. The Fourth Circuit was not pleased:

[I]n *N.L.R.B. v. Lundy Packing Co.,* 68 F.3d 1577 (4th Cir.1995), this court denied enforcement of the Board's bargaining order *outright,* disposing of the petition on the basis of the Board's improper bargaining unit determination.

While the Board contends that our decision constituted some sort of remand, nowhere in our opinion did we so indicate . . . it is unusual that the Board would have interpreted our disposition as implicitly providing such a remedy . . . the Board acted in clear contravention of its jurisdictional limits and sought to bypass this court . . . Here . . . the Board . . . simply proceeded to conduct further proceedings on its own initiative. As we explained in our order of February 15, 1996, the Board had no such authority.

The court reiterates its respect for the Board's role in the area of national labor relations law. The court expects in turn respect for its process and its mandates.

*N.L.R.B. v. Lundy Packing Co.,* No. 95–1364(L)(12–CA–16618) (4th Cir. Mar. 21, 1996). On May 1, 1996, the Fourth Circuit issued a mandate in *Lundy Packing* declar-

---

**14.** (1) *Lundy Packing,* (2) *Good Shepherd,* and (3) arguments *supra* regarding the effect of fraud on the validity of a petition.

ing, simply, "The order of this Court dated 2/15/96 takes effect today."

### F.

In the instant case, the Board has gone a step farther than attempting circumvention of an adverse circuit court decision. It has structured its violations of the Labor Act in such a manner as to effectively deprive the Court of Appeals of its jurisdiction.

■ The Board argues that the employer has failed to meet the second *Leedom* prong, the requirement that the Labor Act not otherwise afford meaningful judicial review of the Board's action, because assuming the Union *eventually* wins an election and is certified, the employer could refuse to bargain with the Union and raise its fraud concerns before the Court of Appeals in defense of a § 8(a)(5) charge, "ordinarily" the manner by which parties obtain review of adverse Board certification decisions under the Act, *South Carolina State Ports Authority v. N.L.R.B.*, 914 F.2d 49, 51 (4th Cir.1990). The availability of such process in this case is illusory.

In the first instance, the Board is withholding the necessary certification and § 8(a)(5) citation, and has indicated through its field examiner that it intends to continue holding elections until it obtains a particular result.[15] The parties are now trapped in an endless cycle of election, objections, and re-election. *Leedom*'s essence is that an abusive pattern of Labor Act violations cannot be shielded from judicial review simply because they do not lend themselves to that review provided for by the Act.

■ Moreover, should the Union finally prevail and obtain Board certification and a bargaining order, the passage of time [16] and the needless depletion of its resources might seriously impair the employer's ability to obtain meaningful judicial review at the circuit level. This leads to the core problem raised by the Board's intransigence: the Court of Appeals is a reviewing court, and as such, it must have something to review if it is to function. In labor cases, the duty to develop factual evidence for the

Court of Appeals to review falls upon the Board. The purpose of conducting the section 9(c) investigation is to obtain "[t]he nature and quality of evidence justifying a conclusion that there is reasonable cause to believe that a question of representation exists." *Modern Plastics*, 400 F.2d at 18. The Court of Appeals will not interview witnesses, conduct handwriting analyses, inspect authorization cards, issue subpoenas, or otherwise develop a factual record. By refusing to conduct the statutorily mandated investigation, the Board denies the circuit court its ability to review the propriety of the Board's actions. The Court of Appeals could again deny enforcement of a Board order based on arbitrary action, but it would be denied access to a factual record by reason of the Board's failure to conduct the investigation.

The Board erroneously claims that this case is identical to *South Carolina State Ports Authority* to the extent "the Board has not authoritatively spoken and must not be precluded by this Court from doing so." (Memo.Opposing Prelim.Inj., p. 28). Not so. Mr. Boddie's statement, the evidence of which is not challenged, serves as an admission that the Board will not do its duty, as do the various arguments advanced here by the Board claiming it has no duty to act. The Court does not "indulge [an] assumption" that the Board "will rule in a certain way and proceed to hold an election," *id.;* it reaches this conclusion on the basis of a sworn affidavit relating the admissions of a Board field examiner. And where the Board erroneously denies it has a legal obligation under the Act, *Leedom* does not require that the Board be afforded an opportunity to ponder the question again at some later time as a prerequisite to judicial review.

### G.

■ In the alternative, the Board argues that because the employer's Request for Re-

---

15. This is a fair inference to draw from the field examiner's statement, before the Union's objections were heard, that the Board had already decided to hold a third election.

16. Contrary to the Board's assertions, the Court does not speak of the ordinary delays inherent in the process envisioned by Congress. Sham hearings on election objections and elections based on forged cards were not contemplated by Congressional sponsors of the Labor Act.

view by the Board was denied without prejudice, review by the Board is still possible and therefore, the Court should not exercise its jurisdiction. There are three flaws inherent in this argument. First, the Board's appearances of bias against the employer in this case, as evidenced by Mr. Boddie's statements, make illusory the fact that it has dismissed plaintiff's claims without prejudice. Second, the hearings at issue do not allow for the employer to address the alleged fraud. The hearings concern only the Union's objections, and thus, given the failure to investigate, there would be nothing relating to the fraud allegations for the Board to review. An exception to the Hearing Officer's report based on the inability to present evidence of fraud would be overruled, since the showing of interest is deemed to be an administrative matter. *Fish Plant Services,* 311 N.L.R.B. 1294, 1993 WL 319504 (1993). "Any exception to the failure to grant Plaintiff's Motion to Dismiss will be denied because the Board makes that determination after an administrative investigation and since no investigation has been or will be conducted, that determination will never be made." (Response to Motion to Dismiss, p. 8).

▬▬ Most importantly, however, the availability of review by the Board is irrelevant. As Perdue points out, *Leedom* does not require an administrative exhaustion of remedies, but the absence of judicial review. *Leedom* cases do not arise unless the Board has violated the Labor Act; the *Leedom* rule would be self-defeating if it allowed the Board to block judicial review of its Labor Act violations by holding out the possibility of yet further Board action. Thus, once the Board commits a violation satisfying the first prong, the only questions that remain under the latter prong are (1) whether *judicial* review is available under the Act, and if not, (2) whether "the absence of *judicial* review would sacrifice or obliterate a right created by Congress." *J.P. Stevens Emp. v. N.L.R.B.,* 582 F.2d 326, 328 (4th Cir.1978) (emphasis added). "If the absence of jurisdiction of the federal courts meant a sacrifice or obliteration of a right which Congress had created, the inference would be strong that Congress intended the statutory provisions governing the general jurisdiction of those courts to control." *Switchmen's Union v. National Mediation Board,* 320 U.S. 297, 300, 64 S.Ct. 95, 96, 88 L.Ed. 61 (1943).

The Board plainly errs in declaring that "[i]t is the absence of the possibility of review rather than the litigable nature which determines whether the *Leedom* standard is met." (Memo.Supporting Dismissal, p. 15). Neither law nor logic support such an interpretation. It is true that "[s]everal cases demonstrate the Board's ability to address and redress forgery claims." *Id.* But that only serves to strengthen the argument that the Board is shirking its duty.

### H.

▬▬ The Court's analysis under the "balance of hardship" test, *Blackwelder Furniture Co. v. Seilig Mfg. Co.,* 550 F.2d 189 (4th Cir.1977), has not changed. If anything, the likelihood of success is now higher, since the Board has refused the opportunity to explain its policy departures and claims emphatically that it is not subject to an explicitly mandatory provision of the Labor Act. The harm suffered by Perdue would be irreparable: if a timely investigation is not conducted, it will never obtain meaningful review of its allegations, and it might be forced to bargain with a union whose president had to forge half its authorization cards to obtain an election.

### II. The FOIA Dispute

▬▬ The Board has taken some action regarding the FOIA requests since the Court's prior order directing immediate compliance with the Act. For the most part, the plaintiff's requests have been met with claims of exemption. Because the Board is no longer ignoring the requests, but merely denying them, it claims that the matter is now moot and ought to be dismissed. The plaintiff, it is argued, must file the appropriate administrative appeals before returning to district court.

This reasoning was explicitly rejected by the Fourth Circuit in *Pollack v. Department of Justice,* 49 F.3d 115 (4th Cir.), *cert. denied,* ⸺ U.S. ⸺, 116 S.Ct. 130, 133 L.Ed.2d 78 (1995). In *Pollack,* as in this case, the FOIA requests were ignored by the

agency for at least ten days, thus triggering district court jurisdiction. Subsequent to the filing of the complaint in district court, the agency took action on the requests, and persuaded the district court to dismiss the matter. The Fourth Circuit disagreed:

> [T]he fact that further agency activity was taking place on [plaintiff's] FOIA request while his enforcement action was pending in court did not require [plaintiff] to appeal administratively each agency determination as it was described in the [agency's] status reports. The district court had jurisdiction over the enforcement action for the entire FOIA request and properly retained jurisdiction, and it was error for the district court to conclude that it was somehow deprived of jurisdiction because [plaintiff] failed to file administrative appeals with the agency head during the litigation.

*Pollack,* 49 F.3d at 119.[17]

If the Board wished to retain administrative control over the FOIA request, it could have simply acknowledged receipt of the request within the time frame allowed for by the law, or at least prior to the filing of the complaint. The Board's "failure to acknowledge, never mind respond, to [the FOIA requests] promptly, met neither the letter nor the spirit of the statute." *Pollack,* 49 F.3d at 121 (Murnaghan, J., concurring). Perdue is now entitled to present its FOIA claims before the Court.

### Conclusion

██ The Board correctly argues that an assertion of jurisdiction under the *Leedom* rule is an extraordinary occurrence. But if the circumstances of this case do not comprise the exception that proves the rule, the Court is at a loss to imagine a better example. A reasonable person viewing the facts of this case would reach the conclusion that the NLRB has failed to carry out its statutory mandate by ignoring established policy and refusing to conduct a plausible investigation.

The substantial evidence of fraud has not only gone unchallenged, but has been buttressed by both the Regional Director's statement that some of the cards were readily suspicious and evidence that the Union has engaged in similar fraud in the *Carolina Food* and *Lundy Packing* cases. Rather than investigate, the Board declares that it is under no duty to do so despite the clear and unambiguous direction of the Labor Act, 29 U.S.C. § 159(c)(1). The Board refuses to obey this statutory duty by defying numerous guidelines and regulations, engaging a significant policy departure which remains unexplained. This occurs against the backdrop of several legal policy reversals by the Board in favor of the Union, a representation to the plaintiff by a Board field examiner that the current hearing is a sham, and ignorance of the plaintiff's FOIA requests sufficient to invoke district court jurisdiction over that dispute.

In committing itself to an endless election cycle, the Board frustrates the ability of the employer to seek review by the Court of Appeals through a technical § 8(a)(5) proceeding. And this on the heels of a mandate by the Circuit Court ordering the Board to cease resisting the Circuit Court's order based on an opinion that the Board improperly assisted this particular local's organizing efforts.

\*     \*     \*

Plaintiff's motion for a preliminary injunction is GRANTED. The National Labor Relations Board and Willie L. Clark, Jr., are hereby ENJOINED from conducting any proceeding or issuing any orders relating to objections filed to the representation election held on April 4, 1996 at plaintiff's facility in Lewiston, North Carolina, pending defendants' full compliance with the mandates of 29 U.S.C. § 159(c). The defendants are further ORDERED to immediately halt any proceedings relating to the second election currently under way, and are ENJOINED from enforcing any orders which may have issued in relation to said representation election. The injunction will be dissolved should

---

**17.** Summary judgment against Pollack was affirmed, however, based on his refusal to pay the appropriate fees.

the defendants make a sufficient demonstration to the Court that they have complied with the mandate of 29 U.S.C. § 159(c)(1) by conducting an appropriate investigation upon which a proper determination could be made as to the question of representation.

The defendants' motion to dismiss is DENIED. The Court will retain jurisdiction over the subject matter of the labor dispute pursuant to *Leedom.* The Court further retains jurisdiction over the matter arising under the Freedom of Information Act.

SO ORDERED.